**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

WILLIAM ANDERSON,

    Plaintiff,

v.                                                          Case No: 6:13-cv-1571-Orl-40TBS

TECHTRONIC INDUSTRIES NORTH AMERICA, INC., ONE WORLD TECHNOLOGIES, INC., and RYOBI TECHNOLOGIES, INC.,

    Defendants.

## ORDER

This cause comes before the Court on Defendants' Rule 50(b) Renewed Motion for Judgment as a Matter of Law and Alternative Request for New Trial (Doc. 131), filed June 8, 2015. Plaintiff responded in opposition on June 12, 2015 (Doc. 135). Upon consideration and review of the trial record, the Court[1] denies Defendants' motions.

### I. BACKGROUND

Plaintiff initiated this lawsuit against Defendants as the designers and manufacturers of a Ryobi brand bench-top table saw, Model No. BTS 10 (hereinafter, the "Table Saw"). In February 2011, Plaintiff used the Table Saw to refinish cabinets with his brother. (Doc. 126, 205:9–206:7). After cutting approximately into a piece of Formica, Plaintiff's hand unexpectedly slipped forward and contacted the saw blade, ultimately resulting in the amputation of the ring, middle, and index fingers of his left hand. (*Id.* at

---

[1] This case was reassigned to the undersigned on April 17, 2015. (Doc. 67). The case was previously assigned to the Honorable Carlos E. Mendoza, United States District Judge.

212:7–218:3). Although the Table Saw was designed and manufactured with a "hood-style" 3-in-1 blade guard, the blade guard was removed by Plaintiff's brother at some point prior to the accident. (*Id.* at 206:8–12; Doc. 56, p. 12).

In his Complaint, Plaintiff sued Defendants for strict products liability and negligence.[2] (Doc. 2). Plaintiff alleged that the Table Saw was defectively designed because it failed to include flesh detection technology. (*Id.* ¶¶ 15–18). Flesh detection technology is a type of technology that, upon detecting a change in an electrical charge applied to a metal saw blade when it contacts human skin, stops the saw blade and slams the blade below the table surface within a matter of milliseconds. (Doc. 125, 13:4–15:9; Pl.'s Exs. 950, 951). Flesh detection technology therefore drastically reduces—and frequently eliminates—the chance of serious bodily injury resulting from contact with an operating saw blade. (Doc. 125, 13:4–15:9).

Defendants dispute that the Table Saw was defectively designed. Specifically, Defendants argue that flesh detection technology was not reasonably available for the Table Saw, as the technology was exorbitantly expensive at the time the Table Saw was manufactured and would have transformed the Table Saw into a product it was never intended to be. (Doc. 56, p. 6). Defendants also point to Plaintiff's own negligence in his operation of the Table Saw, including the removal of the Table Saw's 3-in-1 blade guard and Plaintiff's failure to follow warnings and operating instructions. (*Id.* at pp. 6–7).

The parties proceeded to a jury trial in this case beginning May 1, 2015. On May 12, 2015, the jury returned a verdict in favor of Plaintiff on his strict products liability claim and in favor of Defendants on Plaintiff's negligence claim. (Doc. 116, ¶¶ 1–2). The

---

[2] Plaintiff additionally sued Defendants for breach of the implied warranty of fitness, but abandoned that claim prior to trial. (Doc. 36, p. 15).

2

jury also found that Plaintiff was 75% negligent for his own injuries. (*Id.* ¶¶ 3–4). Thereafter, the Court entered judgment in favor of Plaintiff in the amount of $26,949.37 based on the jury's determination of damages less Plaintiff's comparative negligence. (Doc. 117). Defendants now renew their motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b). In the alternative, Defendants move for a new trial.

## II. RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. Standard of Review

Upon the return of a jury verdict, Federal Rule of Civil Procedure 50(b) allows any party to renew a motion for judgment as a matter of law previously made at trial under Rule 50(a). Judgment as a matter of law should only be granted if no objectively reasonable jury, based on the evidence and inferences adduced at trial and through the exercise of impartial judgment, could reach the verdict reached. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1173 (11th Cir. 2010); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997). Stated differently, the party moving for judgment as a matter of law must show that the trial evidence "is so overwhelmingly [in his favor] that a reasonable jury could not arrive at a contrary verdict." *Middlebrooks v. Hillcrest Foods, Inc.*, 256 F.3d 1241, 1246 (11th Cir. 2001). However, where there is substantial evidence in the trial record which would allow reasonable minds to reach different conclusions, judgment as a matter of law is inappropriate. *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1211 (11th Cir. 2010).

In considering a motion for judgment as a matter of law, the district court must review the record and draw all reasonable inferences therefrom in the light most favorable to the non-moving party. *Brown*, 597 F.3d at 1173. Importantly, the district court must

3

not make credibility determinations or weigh evidence, as these are quintessential functions reserved for the jury. *Id.*

### B. Discussion

Defendants move for judgment as a matter of law on Plaintiff's strict products liability claim.[3] To prove strict products liability in Florida,[4] a plaintiff must establish three elements: (1) the manufacturer's relationship to the product, (2) the defective and unreasonably dangerous condition of the product, and (3) injuries or damages that were proximately caused by the product's defective and unreasonably dangerous condition. *West v. Caterpillar Tractor Co., Inc.*, 336 So. 2d 80, 87 (Fla. 1976). Defendants contend that Plaintiff cannot prove the Table Saw's defective and unreasonably dangerous condition. (Doc. 131, pp. 8–15).

In analyzing Defendants' pretrial motion for summary judgment, the Court discussed the uncertain and potentially evolving nature of what it means for a product to be defective and unreasonably dangerous under Florida law. (Doc. 62, pp. 11–13). In their summary judgment briefs, the parties all applied the law as stated in the Third Restatement of Torts, which requires a plaintiff who asserts strict products liability to show a "reasonable alternative design" and that the manufacturer's or designer's omission of this alternative design "renders the product not reasonably safe." Restatement (Third) of Torts: Products Liability § 2(b). The Court noted, however, that the Florida Supreme Court had not yet expressly adopted the Third Restatement's standard for strict liability

---

[3] Defendants also move for judgment as a matter of law on Plaintiff's negligence claim; however, the Court need not address the issue since the jury returned a verdict in Defendants' favor on that claim.

[4] A federal court sitting in diversity applies the substantive law of the forum state. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Accordingly, the Court applies Florida substantive law to Plaintiff's strict products liability claim.

4

and that Florida's district courts of appeal were split on the question. *Compare Union Carbide Corp. v. Aubin*, 97 So. 3d 886, 894 (Fla. Dist. Ct. App. 2012) (adopting the Third Restatement), *with Liggett Grp., Inc. v. Davis*, 973 So. 2d 467, 476 (Fla. Dist. Ct. App. 2007) (holding that the Second Restatement controls). The Court ultimately applied the law as stated in the Second Restatement of Torts, which takes the view that the availability of a reasonable alternative design is not required for a plaintiff to succeed on a strict products liability claim. *See Davis*, 973 So. 2d at 476.

The Florida Supreme Court recently resolved the issue in *Aubin v. Union Carbide Corp.*, No. SC12-2075, 2015 WL 6513924 (Fla. Oct. 29, 2015). In rejecting the Third Restatement's reasonable alternative design standard, the *Aubin* Court concluded that requiring a plaintiff to demonstrate an alternative design in order to prove a defect unfairly increased the burden on injured consumers, thwarting Florida's long-standing policy of holding designers and manufacturers accountable for defective products. *Id.* at *17–18. The *Aubin* Court therefore recommitted to the approach taken by the Second Restatement—and applied by this Court on summary judgment—that the availability of a reasonable alternative design is only one factor to consider in determining whether a product is defective. *Id.* at *18–19.

Operating under the Second Restatement's approach, Florida employs both the consumer expectations and the risk-utility theories for determining whether a product is defective and unreasonably dangerous so as to impose strict liability:

> Under the consumer-expectation theory a product is defectively designed if the plaintiff is able to demonstrate that the product did not perform as safely as an ordinary consumer would expect when used in the intended or reasonably foreseeable manner.
>
> . . . .

5

> Under the risk-utility theory a product is defectively designed if the plaintiff proves that the design of the product proximately caused the plaintiff's injuries and the defendant fails to prove that on balance, the benefits of the design outweigh the risk of danger inherent in the design.

*Force v. Ford Motor Co.*, 879 So. 2d 103, 106 (Fla. Dist. Ct. App. 2004); *accord Aubin*, 2015 WL 6513924, at *19 ("[T]he jury instructions approved by this Court use both the consumer expectations test and risk utility test as alternative definitions of design defect."). A plaintiff may prevail by proving either theory. *See Aubin*, 2015 WL 6513924, at *19. In this case, the Court instructed the jury on both the consumer expectations theory and the risk-utility theory. (Doc. 115, Jury Instr. No. 8). Because the jury verdict form submitted by the parties in this case did not ask the jury to identify under which theory they found the Table Saw defective, the Court only needs to find sufficient evidence in the trial record to support one theory of liability. (*See* Docs. 57, 59, 116).

In order to prevail under a risk-utility theory of strict products liability, a plaintiff must show that, on balance, the risk of danger posed by the product outweighs the benefits of the product to consumers. *Radiation Tech., Inc. v. Ware Constr. Co.*, 445 So. 2d 329, 331 (Fla. 1983). The risk-utility theory requires an analysis of several factors, such as the likelihood of potential injury, the gravity of potential injury, the product's usefulness, the availability of a safer product which meets the same needs, the obviousness of the danger posed by the product, the level of danger ordinarily expected in the product by the public, the sufficiency of instructions and warnings which accompany the product, and the availability of an alternative design which would reduce or eliminate the danger posed by the product without significantly sacrificing the product's usefulness or making the product unduly expensive. *Id.*; *Auburn Mach. Works Co., Inc. v. Jones*, 366 So. 2d 1167, 1170 (Fla. 1979). No single factor is determinative or even necessary; all that is required to

impose strict liability is to show that the risk of danger posed by the product outweighs its usefulness.  *See Auburn Mach. Works*, 366 So. 2d at 1170.

Defendants insist that the evidence submitted at trial overwhelmingly demonstrates that the utility of the Table Saw outweighs any risk associated with its use. First, Defendants produced evidence at trial showing that the Table Saw is useful in that it makes a number of different types of cuts, makes those cuts in a safer manner than other technologies and techniques, and is affordable and transportable.  Defendants' Senior Director of Product Safety, Thomas Hill, testified that the Table Saw is a "very versatile tool" which is capable of performing a wide range of useful woodworking cuts. (Doc. 128, 21:9–34:13).  Mr. Hill further informed the jury that, before saws like the Table Saw became prevalent, consumers used to fashion homemade table saws by precariously screwing a handheld circular saw to the underside of a piece of plywood. (*Id.* at 35:7–36:14).  The Table Saw therefore presents consumers with a much safer alternative than previous woodworking techniques.  (*Id.* at 36:15–37:1).

Defendants also produced evidence showing the obviousness of risk associated with the Table Saw and that Defendants instructed consumers on these risks with detailed warnings and instructions.  Indeed, just about every witness who testified on the issue acknowledged in some way the inherent and obvious risks associated with utilizing the Table Saw.  (*See, e.g.*, Doc. 125, 37:24–38:3; Doc. 129, 23:22–24:12).  Moreover, Defendants introduced the warnings and instructions accompanying the Table Saw (Defs.' Exs. 11, 33), and elicited testimony demonstrating that Plaintiff ignored these warnings and instructions and otherwise operated the Table Saw improperly (Doc. 129, 37:12–41:23, 43:15–45:23, 52:16–53:25).

Finally, Defendants produced evidence indicating that flesh detection technology was not reasonably available for the Table Saw, as installation of flesh detection technology would have transformed the Table Saw from a lightweight, affordable saw into a much heavier saw costing many times more. On this point, Defendants' Senior Director of Advanced Engineering, David Peot, testified that flesh detection technology was unproven and faced myriad logistical and safety problems at the time the Table Saw was manufactured. (Doc. 123, 44:5–64:14, 123:12–125:8; Defs.' Ex. 84). Defendants' engineering experts further testified that adding flesh detection technology to saws like the Table Saw would approximately double the product's weight and increase its price tenfold, essentially eliminating lightweight, affordable table saws from the marketplace. (Doc. 129, 64:19–66:13, 193:3–12).

However, Plaintiff produced substantial evidence at trial rebutting or undermining Defendants' arguments such that a reasonable jury could conclude that the risks posed by the Table Saw outweighed its usefulness. To start, Plaintiffs produced a plethora of documents from the United States Consumer Product Safety Commission ("CPSC") and the Power Tool Institute ("PTI")[5] demonstrating that Defendants, along with the power tool industry as a whole, were well-aware that tabletop saws like the Table Saw posed a significant risk of injury. (Pl.'s Exs. 1, 7, 25, 33, 46, 625, 1105-Q). Specifically, the CPSC informed the power tool industry as early as 1976 that table saws posed an inordinately high risk in terms of both frequency and severity of injury. (Pl.'s Ex. 1105-Q). The CPSC further concluded that existing blade guards, warnings, and general consumer education were not enough to address this risk of injury and urged the power tool industry to adopt

---

[5] PTI is a trade association of power tool manufacturers which promotes the interests of the power tool industry. (Doc. 128, 30:9–18).

8

flesh detection technology as early as 2001, at least three years before the Table Saw was manufactured. (Pl.'s Exs. 7, 625; Doc. 123, 97:4–99:4). Plaintiff's engineering and power tool industry expert, Darry Holt, confirmed that Defendants have known for decades about the grave risk of injury posed by table saws, but that they have done little to directly address the problem. (Doc. 125, 47:5–52:2).

On the issue of whether flesh detection technology was feasible at the time the Table Saw was manufactured, Plaintiff produced substantial evidence undercutting Defendants' position that the technology was unproven and would have transformed the Table Saw into a heavy, unwieldy, and overly expensive product. Plaintiff produced a CPSC report indicating that "braking systems" were feasible as early as 1976 and, if added to a table saw, would increase the manufacturing cost by only 5–10%. (Pl.'s Ex. 1105-Q, pp. 19, 22). Regarding flesh detection technology specifically, Plaintiff produced internal documents from Defendants indicating that adding flesh detection technology to the Table Saw in 2001 would have increased the manufacturing cost by less than $100 and would have raised the Table Saw's retail price to $230, far from the thousand dollar price tag suggested by Defendants' witnesses. (Pl.'s Exs. 801, 1032; Doc. 125, 203:22–208:6). Further, Defendants' power tool research and design expert, Peter Domeny, opined on cross-examination that adding flesh detection technology to the Table Saw would have increased the product's weight to about eighty pounds, which was only slightly heavier than the average weight for similar table saws. (Doc. 129, 188:2–189:10). Further still, one of Defendants' engineers, Philip Minalga, revealed that flesh detection technology would have been relatively simple to incorporate into the Table Saw around 2001 or 2002. (Doc. 126, 170:1–176:21).

Moreover, Plaintiff adduced ample evidence at trial which would allow a reasonable jury to infer that Defendants and the power tool industry colluded to keep flesh detection technology out of its products, despite its feasibility at the time the Table Saw was manufactured. Many witnesses testified about how Defendants purposely avoided incorporating flesh detection technology into their products because they did not want to pay the licensing rights to the technology's inventor and patent-holder, Dr. Stephen Gass. Defendants' Senior Director of Advanced Engineering, Mr. Peot, testified that Defendants ultimately stopped negotiating a license for the flesh detection technology patent in order to "develop an alternative device that would not require licensing from [Dr. Gass]," thus "getting around the patents." (Doc. 123, 98:23–100:21; Pl.'s Ex. 625). Defendants' power tool research and design expert, Mr. Domeny, and Plaintiff's engineering and power tool industry expert, Mr. Holt, also confirmed that the major power tool manufacturers created a joint venture the primary goal of which was to avoid paying licensing royalties to Dr. Gass. (Doc. 126, 49:12–51:6; Doc. 129, 201:10–205:4). Mr. Domeny went so far as to explain that it was the original intent of the joint venture to make a "really inexpensive" alternative to Dr. Gass' technology. (Doc. 129, 191:15–192:8).

Based on the above-cited evidence and a careful review of the entire trial record, the Court is satisfied that there is substantial evidence for a reasonable jury to conclude that the risks of the Table Saw outweighed its benefits. Judgment as a matter of law on Plaintiff's strict products liability claim is therefore inappropriate.

### III.   ALTERNATIVE MOTION FOR NEW TRIAL

#### A.   Standard of Review

Federal Rule of Civil Procedure 59(a)(1) allows a district court to grant a new trial for a variety of reasons, including when the trial proceedings were patently unfair, the

damages awarded by the jury are excessive, or, as asserted here, the court erred in admitting or excluding evidence. *See Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1186 (11th Cir. 2001). However, "[n]ew trials should not be granted on evidentiary grounds unless, at a minimum, the verdict is against the great—not merely the greater—weight of the evidence." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1312–13 (11th Cir. 2013). To determine whether an evidentiary error warrants a new trial, the district court must evaluate several factors, such as the number of errors, the significance of the error when viewed against all admissible evidence on the issue, the overall prejudicial effect of the error on the jury, and whether a limiting instruction was given. *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1162 (11th Cir. 2004). An evidentiary error is harmless, and therefore insufficient to warrant a new trial, where it is "unlikely . . . that the jury could have been swayed erroneously by the wrongfully admitted [or excluded] evidence." *Id.*

  **B.**  **Discussion**

Defendants move for a new trial based on what they perceive as three evidentiary errors: (1) the exclusion of evidence relating to Underwriters Laboratories Standard 987 ("UL 987"), (2) the admission of Plaintiff's expert witness, and (3) the admission of post-2004 design changes to the Table Saw. The Court addresses each alleged evidentiary error in turn.

  **1.**  **Exclusion of UL 987**

Defendants begin by asserting that the Court erred by excluding evidence concerning UL 987. (Doc. 131, pp. 17–19). UL 987 is a voluntary industry standard which advises that manufacturers should install a 3-in-1 blade guard on saws like the Table

Saw. (Doc. 122, 55:2–56:3). Although noncompliance with UL 987 is not illegal, the CPSC takes the view that failure to adhere to UL 987 may indicate that a table saw is defective or unreasonably dangerous and may warrant a recall of the product. (*Id.* at 56:4–57:7). The parties do not dispute that the Table Saw complied with UL 987 by including a 3-in-1 blade guard. Notwithstanding, the Court excluded presentation of evidence regarding the Table Saw's compliance with UL 987, finding that any relevance was substantially outweighed by prejudice to Plaintiff and confusion to the jury. (Doc. 69, pp. 2–3; Unoff. Hr'g Tr. 37:20–45:6, Apr. 16, 2015).

Defendants' argument is twofold. First, Defendants insist that compliance with UL 987 is critical to demonstrating that the Table Saw was not defective and unreasonably dangerous. Defendants seem to reason that, by incorporating the 3-in-1 blade guard in accordance with UL 987, the Table Saw could not have been found to be defective. However, the issue at trial was not whether the Table Saw was defective because of the 3-in-1 blade guard; instead, the issue at trial was whether the Table Saw was defective because it lacked flesh detection technology. Indeed, UL 987 has nothing to do with flesh detection technology. (Doc. 122, 60:25–61:2). Therefore, any evidence on the 3-in-1 blade guard as it pertained to the issue of product defect would have been irrelevant. Further, as the Court noted at the final pretrial conference, such evidence would have confused the jury by giving the improper impression that compliance with UL 987 acts as a defense to the lack of flesh detection technology. (Unoff. Hr'g Tr. 44:22–45:6, Apr. 16, 2015).

Second, Defendants claim that Plaintiff opened the door to evidence on compliance with UL 987 by discussing why Plaintiff removed the 3-in-1 blade guard from the Table Saw. Defendants specifically point to evidence and testimony elicited by

Plaintiff indicating that the 3-in-1 blade guard was cumbersome and hindered the saw operator from making certain types of cuts. (Doc. 125, 43:22–50:24; Pl.'s Ex. 1105-Q). Defendants again confuse the issues however. Plaintiff did not produce evidence about the 3-in-1 blade guard to imply that the Table Saw was defective, but rather to confront Defendants' affirmative defense that Plaintiff was comparatively negligent. Without a doubt, Defendants presented considerable evidence suggesting that Plaintiff acted negligently by ignoring the warnings and instructions that came with the Table Saw and removing the 3-in-1 blade guard, likely leading, at least in part, to the jury's finding that Plaintiff was 75% negligent for his own injuries. Discussion of the 3-in-1 blade was therefore relevant on the issue of Plaintiff's own allegedly negligent conduct, not an open door to discuss the blade guard in terms of product defect.

For these reasons, the Court concludes that it did not err in excluding evidence concerning Defendants' compliance with UL 987.

### 2. Admission of Expert Testimony of Darry Holt

Next, Defendants maintain that the Court erred in denying their pretrial *Daubert* motion and allowing Plaintiff's expert, Darry Holt, to testify at trial on the issues of design defect and the efficacy and technological feasibility of flesh detection technology. (Doc. 131, pp. 19–22). It is the Court's gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury under the mantle of reliability that accompanies the appellation 'expert testimony.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005) (internal quotation marks omitted), *cert. denied*, 546 U.S. 935 (2005). To do this, the Court must engage in a rigorous three-part inquiry, which requires the Court to ask whether "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his

conclusions is sufficiently reliable . . . ; and (3) the testimony assists the trier of fact." *Id.* at 1291–92. Defendants challenge Mr. Holt's qualifications and methodology.

"[E]xperts may be qualified in various ways," including by "knowledge, skill, experience, training, or education." *United States v. Frazier*, 387 F.3d 1244, 1260–61 (11th Cir. 2004) (en banc) (emphasis omitted), *cert. denied*, 544 U.S. 1063 (2005). "The qualification standard for expert testimony is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility." *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (internal quotation marks omitted).

Defendants wish to color Mr. Holt as unqualified to render opinions in this case because they assert he is a "professional witness" whose only experience is testifying at trials. (Doc. 131, p. 19). However, Defendants ignore the bulk of Mr. Holt's training and experience as an engineer. Mr. Holt earned a bachelor's degree in mechanical engineering, has ten years of experience as a mechanical engineer in product production, maintenance, and manufacturing, and has thirty-eight years of experience as a consulting engineer, during which he "evaluat[ed] the safety design and condition of hundreds of machines and products of all types, including table saws." (Doc. 35-1, ¶ 2 & Exs. 1, 2; Doc. 125, 5:4–12:7). Mr. Holt additionally illuminated at trial that he has spent more than 4,000 hours over the past ten years specifically investigating and testing the flesh detection technology at issue in this case. (Doc. 125, 12:12–17:7). Defendants' position that Mr. Holt is not qualified to render expert opinions on table saw design and the efficacy and technological feasibility of flesh detection technology simply holds no weight.

In evaluating the reliability of an expert's methodology, the Court looks to a number of factors, including (1) whether the methodology has been tested, (2) whether the

methodology has been subjected to peer review and publication, (3) rates of error associated with the methodology, (4) the existence of standards governing the methodology, and (5) the methodology's degree of acceptance in the relevant scientific community.  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993). "Evidence that derives from principles and techniques of uncontroverted validity is, of course, readily admissible, subject to the qualification of the proposed witness and . . . a showing that proper safeguards were employed . . . ."  *United States v. Downing*, 753 F.2d 1224, 1232 (3d Cir. 1985).

Defendants attack Mr. Holt's methodology in reaching his opinions in this case because they contend he applied no engineering or scientific knowledge, but rather relied solely on facts he learned during the course of discovery.  To the contrary, however, Mr. Holt's expert report and trial testimony reveal that he applied well-established engineering and scientific principles to test flesh detection technology, extensively described his testing procedures, and outlined in detail his results, observations, and calculations. (Doc. 35-1, ¶¶ 91–222; Doc. 125, 12:12–16:24, 17:13–18:22).  Mr. Holt also examined and tested Defendants' Table Saw model and based his opinions regarding the product's defective nature on his testing.  (Doc. 35-1, ¶¶ 24–46).  Mr. Holt further supported his methodology through volumes of engineering handbooks, standards, and treatises of uncontroverted reliability.  (Doc. 35-1, ¶ 6 & Ex. 4).  There is no doubt that Mr. Holt employed a sufficiently reliable methodology in forming his opinions.

For these reasons and for the reasons stated by the Court when ruling on Defendants' pretrial *Daubert* motion (*see* Doc. 62, pp. 2–9), the Court concludes that it did not err in permitting Mr. Holt to offer opinions on the issues of design defect and the efficacy and technological feasibility of flesh detection technology.

### 3. Admission of Evidence on Post-2004 Design Changes

Finally, Defendants contend that the Court erred by permitting evidence of design changes to table saws that occurred after the Table Saw was manufactured in 2004. (Doc. 131, pp. 23–24). Defendants maintain that evidence regarding both actual and proposed design changes to the Table Saw after the Table Saw's manufacture was inadmissible as a subsequent remedial measure and irrelevant on the issue of whether the Table Saw was defective and unreasonably dangerous. Defendants also state that subsequent design changes undertaken by other third party manufacturers should also have been excluded as irrelevant.

Federal Rule of Evidence 407 provides, "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove . . . a defect in a product or its design." However, evidence of a manufacturer's subsequent remedial measures may be admitted to prove "the feasibility of precautionary measures" where such feasibility is disputed. Fed. R. Evid. 407; *cf. Wood v. Morbark Indus., Inc.*, 70 F.3d 1201, 1208 (11th Cir. 1995) ("The trial court also acted properly in cautioning Morbark's attorney that, if feasibility ever became an issue, evidence of subsequent remedial measures would be allowed."). Rule 407's proscription additionally does not apply to evidence of subsequent remedial measures undertaken by parties who are not defendants in the case. *Millennium Partners, L.P. v. Colmar Storage, LLC*, 494 F.3d 1293, 1302–03 (11th Cir. 2007).

There should be little doubt that the feasibility of flesh detection technology at the time of the Table Saw's manufacture remained a hotly contested issue throughout trial. Accordingly, evidence of subsequent design changes by both Defendants and other manufacturers of table saws is not barred by Rule 407. Moreover, evidence regarding

16

design changes adopted by other table saw manufacturers is relevant to the question of whether flesh detection technology was reasonably available to the power tool industry as a whole and whether Defendants could have reasonably incorporated flesh detection technology into Plaintiff's Table Saw at the time it was manufactured in 2004. The Court therefore did not err in permitting evidence concerning subsequent design changes to table saws manufactured by Defendants or other manufacturers.

IV.   **CONCLUSION**

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** that Defendants' Rule 50(b) Renewed Motion for Judgment as a Matter of Law and Alternative Request for New Trial (Doc. 131) is **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on November 23, 2015.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record